**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES** | **CRIMINAL ACTION** |
| **v.** | |
| **JOSEPH VITO MASTRONARDO, JR.** | **NO.  12-388  -01** |
| **JOHN MASTRONARDO** | **-02** |
| **JOSEPH F. MASTRONARDO** | **-03** |
| **ERIC WOEHLCKE** | **-04** |
| **HARRY MURRAY** | **-05** |
| **JOSEPH VITELLI** | **-06** |
| **ANNA ROSE VITELLI** | **-07** |
| **PATRICK TRONOSKI** | **-08** |
| **EDWARD FEIGHAN** | **-09** |
| **KENNETH COHEN** | **-10** |
| **SCHUYLER TWADDLE** | **-11** |
| **MICHAEL LOFTUS** | **-12** |
| **JOANNA MASTRONARDO** | **-16** |

**DuBOIS, J.**                                                   **December 13, 2013**

**M E M O R A N D U M**

## I.  INTRODUCTION

On August 1, 2012, a federal grand jury in the Eastern District of Pennsylvania named

defendants in a twenty-three count indictment.   The Indictment charges defendants with, *inter*

*alia*, participating in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d), managing an

illegal gambling business in violation of 18 U.S.C. § 1955, and engaging in money laundering in

violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Presently before the Court is defendants' Motion to Suppress Wiretap and Physical

Evidence.  Defendants seek to suppress direct and derivative evidence acquired from wiretaps

and GPS surveillance of defendants' vehicles.

The Court conducted a three-day evidentiary hearing on all pending motions — including the instant motion to suppress — from September 30, 2013 through October 2, 2013.  Oral argument on all pending motions was held on November 18, 2013.  This Memorandum constitutes the Court's findings of fact and conclusions of law with respect to defendants' Motion to Suppress Wiretap and Physical Evidence.  For the reasons that follow, defendants' motion is denied.

## II.  BACKGROUND

Defendants have been indicted for crimes arising from their alleged participation in an illegal gambling business — the Mastronardo Bookmaking Organization ("MBO").[1]  The MBO was headquartered in Montgomery County, Pennsylvania with members and associates located across the United States and in Costa Rica.  Defendants worked as bookmakers, agents, office employees, and technical-support staff.  The MBO used password-protected websites, toll-free phone numbers, and personal meetings to take bets on a variety of sports.  Bettors received a line of credit through their accounts, and bettors could pay gambling debts on losing bets using cash, check, or wire transfer.  The MBO paid winning bets in cash.  At its peak, the MBO had over one thousand bettors and generated millions of dollars of betting activity a year.

### A.  Early Stages of Investigation and Confidential Sources

Police had investigated some of the defendants in 2006 for illegal bookmaking.  During that investigation, police used wiretaps and search warrants to discover, *inter alia*, (1) the identity of several defendants, (2) the location of an office used to conduct bookmaking activity, (3) the URL of a website used to collect wagers, and (4) the existence of large sums of hidden currency in the residences of some defendants.

---

[1] The facts in this paragraph are taken from the Indictment as background and are not part of the Court's findings of fact.

John Mastronardo, Joseph Vito Mastronardo, Jr., and Edward Feighan were arrested on June 5, 2006, and all three plead guilty to bookmaking and conspiracy to commit bookmaking. John Mastronardo received a sentence of two to twenty-three months confinement and five years of probation; Joseph Vito Mastronardo, Jr. received a sentence of two years of intermediate punishment, including six months of house arrest, and five years of probation; and Feighan received a sentence of two years of probation.  After shutting down the illegal gambling business in 2006, police suspected that the business might resume operations because its website displayed the message "sorry for the inconvenience, we will be back up shortly."

The investigation at issue in this case began in October 2008, when Detective James Vinter of the Montgomery County Detectives Bureau made contact with Confidential Source One ("CS1").  CS1 told Detective Vinter that he had placed bets over the phone with Feighan and that Feighan had resumed bookmaking activity in Montgomery County.  CS1 claimed that Feighan paid and collected gambling debts on a weekly basis at the Century House in Hatfield, Pennsylvania.  Detective Vinter memorialized the conversation approximately five months after the meeting in a police report dated February 17, 2009.

CS1 met Detective Vinter a second time in May 2009.  At that time, CS1 reported that Feighan continued to take bets from individuals in Montgomery County and that Feighan had bragged about a group of bettors from the Lehigh Valley Country Club, whose weekend wagers could escalate above $50,000.  On at least one occasion, CS1 said he overheard Feighan say that he had money to deliver to Joseph Vito Mastronardo, Jr. at the Cedarbrook Country Club. Detective Vinter met CS1 a third time during the second week of August 2009.  At that time, CS1 told Detective Vinter that Feighan was using a website at ExclusiveWager.com.  CS1

provided police with his user name and password.  The May and August 2009 conversations with CS1 were memorialized by Detective Vinter in two police reports dated August 17, 2009.

Police were able to corroborate several pieces of information obtained from CS1.  First, the 2006 arrests and guilty pleas of Joseph Vito Mastronardo, Jr. and Feighan corroborated information that they were working together.  Second, Detective Vinter remembered that Joseph Vito Mastronardo, Jr. was a member of the Cedarbrook Country Club during the 2006 investigation.  Third, police observed Feighan making trips to the Century House on the days reported by CS1.  Fourth, CS1 correctly identified a picture of Feighan's girlfriend, whom police had observed during the 2006 investigation.  Lastly, police verified that the website, username, and password provided by CS1 were operational.  On August 18, 2009, on application of Detective Vinter, the Court of Common Pleas of Montgomery County authorized disclosure of the toll records on Feighan's cellular phone and installation of a GPS tracker on Feighan's vehicle.

On August 24, 2009, Detective Vinter learned that police in Upper Moreland Township, Pennsylvania had taken photographs of a laminated sheet containing names and phone numbers that they had found in Joseph Vito Mastronardo, Jr.'s vehicle.  Upper Moreland police recovered the vehicle after it had been stolen, and they photographed the laminated sheet during an investigation of the car thieves.[2]  On August 25, 2009, Detective Vinter obtained and examined the photographs and found two names that he believed to be associated with defendants' illegal gambling business: (1) "Pat TT", who Detective Vinter believed to be defendant Patrick Tronoski; and (2) "Ed Fagan", who Detective Vinter believed to be defendant Edward Feighan.

---

[2] The Court's findings of facts and conclusions of law concerning the search of Joseph Vito Mastronardo, Jr.'s car are set forth in further detail in the Court's Memorandum and Order dated December 13, 2013 ruling on defendant Joseph Vito Mastronardo, Jr.'s Motion to Suppress Evidence (Document No. 307).

The "Pat TT" phone number matched a phone number associated with Tronoski during the 2006 investigation.

On September 9, 2009, Detective Vinter met with CS1 a fourth time. At that time, CS1 reported that, on at least one occasion, he had seen Feighan use an alternate cell phone to speak with Joseph Vito Mastronardo, Jr. Detective Vinter believed that the phone number listed for "Ed Fagan" on the laminated sheet was Feighan's alternate cell phone, but he was unable to recover subscriber information on that phone because the phone number was registered to a prepaid cellular service provider. Thereafter, on September 14, 2009, Detective Vinter applied for and obtained the toll records for the phone number, but none of the incoming or outgoing calls matched phone numbers known to the police. Detective Vinter memorialized this "updated report" from CS1 in a police report dated September 22, 2009. Ex. D-1 at USA-4530.

Next, Detective Vinter met with Confidential Source Two ("CS2") in November 2009. Detective Vinter and CS2 had a fifteen-year relationship, beginning when Detective Vinter worked as a police officer in Whitpain Township. In November 2009, CS2 reported that Tronoski and Jack Pennington, a former police officer, were actively taking bets in Montgomery County. During follow-up meetings, CS2 provided three material pieces of information: (1) Tronoski was referring new bettors to Pennington; (2) Pennington was collecting bets and settling accounts as a sub-bookmaker for Tronoski; and (3) bettors could make wagers using the website at ExclusiveWager.com, a toll-free phone number, or directly with Pennington through his personal phone number. Detective Vinter did not memorialize these conversations with CS2 in police reports. The conversations were first documented in an affidavit dated January 15, 2010, which the police used to obtain authorization for GPS surveillance of Tronoski's vehicle.

Detective Vinter believed CS2 was reliable.  Since 2006, CS2 had provided Detective Vinter accurate and reliable information that led to the arrest and prosecution of four individuals for drug-related offenses.  Moreover, factual information provided by CS2 in November 2009 was corroborated by police.  CS2 knew of Tronoski's 2003 arrest for illegal bookmaking and correctly provided Tronoski's home address, phone number, place of business, and the make and model of his vehicle.  The police also verified that Pennington was a former police officer.  Based on information provided by CS2, police applied for and, on December 15, 2009, obtained authorization to examine and monitor the toll records for Tronoski's cellular phone.  Police verified that between August 31, 2009 and February 12, 2010 Tronoski had 120 cell phone contacts with Pennington.

### B.  Final Stages of Investigation and Wiretap Surveillance

The police initiated wiretap surveillance on five defendants during the final stages of the investigation: (1) Tronoski, (2) Feighan, (3) Joseph Vito Mastronardo, Jr., (4) Eric Woehlcke, and (5) John Mastronardo.  All wiretaps were authorized by order of Pennsylvania Superior Court Judge Susan Gantman.  The relevant dates for each wiretap are as follows:

|  | Authorization Granted | Interception Ends | Authorization Expires | Recordings Sealed |
|---|---|---|---|---|
| Tronoski | February 24, 2010 | March 26, 2010 | March 26, 2010 | April 7, 2010 |
| Feighan | February 24, 2010 | March 26, 2010 | March 26, 2010 | April 7, 2010 |
| Joseph Vito Mastronardo, Jr. | March 1, 2010 | April 1, 2010 | April 29, 2010[3] | April 7, 2010 |
| Woehlcke | March 9, 2010 | April 1, 2010 | April 8, 2010 | April 7, 2010 |
| John Mastronardo | March 12, 2010 | April 1, 2010 | April 11, 2010 | April 7, 2010 |

---

[3] Police received an extension order for the Joseph Vito Mastronardo, Jr. wiretap on March 29, 2010, which authorized continuing interception until "thirty (30) days from the expiration of this Court's original Order on March 30, 2010."  Ex. G-3 Tab I at 7.

Lieutenant Detective Stephen Forzato was responsible for the investigation, including supervision of the wiretaps.  Lieutenant Forzato had participated in forty-three wiretaps during his career and had twenty years of experience teaching classes and facilitating lectures on state and federal wiretap law.  Five detectives worked under Lieutenant Forzato's supervision on the investigation: (1) Vinter, (2) Michael Reynolds, (3) David Holtzman, (4) Erick Echevarria, and (5) David Evans.

In accordance with Pennsylvania law, Judge Gantman required that monitors "minimize" interceptions — stop listening and recording non-pertinent calls to protect the privacy interests of the subjects of the interception.  On February 24, 2010, Assistant District Attorney Tonya Lupinacci and Lieutenant Forzato held a meeting with all wiretap monitors to discuss a minimization directive issued by ADA Lupinacci.  The minimization directive stated that (1) privileged communications should not be intercepted and that (2) non-pertinent calls should not be recorded unless the call was less than five minutes and took place within the first five days of the wiretap.   Thereafter, non-pertinent conversations were to be "spot monitored," meaning that monitors would listen to thirty seconds of the conversation at periodic intervals to determine if the conversation had again become pertinent.  Additional monitor's meetings were held on March 1, 2010, March 9, 2010, and March 12, 2010.  After five days of interception, Lieutenant Forzato met with monitors to "tighten up" the bounds of pertinent and non-pertinent conversations for each wiretap.

All monitors were certified under Pennsylvania law to listen to the wiretaps.   Sign-in logs show that between four and seven monitors watched the intercepted lines each day.  The police usually assigned two monitors to a twelve-hour morning shift from 7:00am to 7:00pm and two monitors to a twelve hour evening shift from noon until midnight.  Regularly, one to three

additional monitors would sign in during business hours to help monitor the ongoing wiretaps. The sign-in logs did not include other technicians present in the wiretap facility who could assist if needed.  After an intercepted call, monitors would record in monitor logs, *inter alia*, whether the call was pertinent or non-pertinent and whether the call had been minimized.

Every ten days, police submitted status reports on the open wiretaps to Judge Gantman. Judge Gantman reviewed the monitor logs, the total number of intercepted calls, the number of calls minimized, and relevant evidence recovered from pertinent conversations.  The aggregate number of minimized calls is as follows:

|  | Total Calls Intercepted | Calls Longer than Two Minutes | Calls Longer than Two Minutes Deemed Non-Pertinent[4] | Calls Longer than Two Minutes that were Minimized |
|---|---|---|---|---|
| Tronoski | 1030 | 237 | 68 | 55 |
| Feighan | 149 | 80 | 34 | 16 |
| Joseph Vito Mastronardo, Jr. | 868 | 309 | 184 | 32 |
| Woehlcke | 1010 | 414 | 142 | 81 |
| John Mastronardo | 746 | 313 | 70 | 99 |
| Total for Investigation | 3803 | 1353 | 498 | 283 |

Police conducted wiretaps from a facility they referred to as "the plant."  Each wiretap had a monitoring station in the plant that would present call data and audio to a monitor.  Four monitoring stations were placed in one office, and the fifth monitoring station was placed in an adjacent room.  The police used Pen-Link — a third-party vendor — to design, install, and support the computer software that intercepted communications on mobile devices.  Pen-Link

---

[4] These are calls deemed non-pertinent by monitors at the time the conversation ended.  The Court notes that this number does not correlate precisely to the number of calls minimized because not all calls that a monitor anticipates may become pertinent actually become pertinent.

connected each monitoring station to the wiretap server, which housed the drives that transcribed the wiretap recordings onto optical discs.  Data on optical discs could not be altered or modified, but new data could be added to the discs until they were finalized and ejected.  Pen-Link had the ability to remotely access the wiretap server to provide technical support and assistance, which police referred to as "tunneling in."

Lieutenant Forzato relied on Pen-Link technical support to resolve problems with the computer software.  Electronic interception using the Pen-Link system was different than electronic interception of hardwired phone lines.  Pen-Link worked with the phone company to push all incoming and outgoing calls on intercepted phone numbers into a "conference call," from which the police could hear the audio portions of the call.  The phone company would provide corresponding call data containing the time and participating phone numbers, and Pen-Link's software would display and record the call data and audio on the appropriate wiretap.

On March 10 and March 11, 2010, seven phone calls were intercepted with no audio or call data.  On March 11, 2010, Lieutenant Forzato contacted Pen-Link to "tunnel in" to the wiretap server to resolve the problem, and they did so.[5]  While Pen-Link had control of the server, someone using Feighan's phone initiated a call to Larry Nelson.  Although the call data appropriately appeared on Feighan's monitoring station, the audio "split" onto Joseph Vito Mastronardo, Jr.'s monitoring station and was recorded on Joseph Vito Mastronardo, Jr.'s optical disc.  Lieutenant Forzato believed this constituted an "alarming evidentiary problem" because

---

[5] The Court finds that Pen-Link "tunneled in" to the wiretap server on March 11, 2010. Lieutenant Forzato testified that Pen-Link remotely accessed their server, Tr. Pretrial Mots. Hr'g Day 1 at 146, and police can easily identify when Pen-Link "tunnels in" because the police must grant permission and can see the cursor moving on their screens. *Id.* at 92.  Although Chris Havel, a customer-service engineer for Pen-Link, testified that he could not locate a service-call record on March 11, 2010, Pen-Link records only "a majority" of their service calls and had several calls on that date from blocked numbers. Tr. Pretrial Mots. Hr'g Day 2 at 170, 175–76.

the split threatened the integrity of the ongoing wiretaps.  Due to the call data and audio splitting,

Joseph Vito Mastronardo, Jr.'s wiretap recording contained audio from a call that he did not

place without corresponding call data to identify the source of the conversation.  Lieutenant

Forzato believed that Pen-Link caused the call data and audio files to split on March 11, 2010,[6]

so he ordered that Pen-Link not "tunnel in" for the remainder of the ongoing wiretaps.

Lieutenant Forzato mistakenly believed that the wiretap recordings could only be

finalized by having Pen-Link "tunnel in" to the wiretap server, and he had prohibited them from

doing so because he thought "tunneling in" would jeopardize ongoing wiretaps.  He allowed only

Pen-Link to finalize wiretap recordings to avoid errors in the process.[7]  Surveillance on the

---

[6] The government presented conflicting testimony about what caused the call data and audio to split on March 11, 2010.  Lieutenant Forzato and Detective Echevarria testified that they had personally observed splitting on several occasions during previous investigations when Pen-Link "tunneled in" to the wiretap server.  Tr. Pretrial Mots. Hr'g Day 1 at 25–26, 147.  Chris Havel testified that Pen-Link did not cause the data and audio to split and speculated that the phone company caused the problem.  Tr. Pretrial Mots. Hr'g Day 2 at 180.  Havel admitted, however, that multiple law enforcement agencies have complained about similar problems when Pen-Link remotely accessed law-enforcement servers.  *Id.* at 183.

The Court finds that Lieutenant Forzato's belief that Pen-Link caused the call data and audio to split was reasonable.  The Court does not credit Havel's testimony regarding the cause of the splitting for three reasons: (1) Forzato and Echevarria's experience contradicts the testimony, (2) their experience is corroborated by complaints from other law enforcement agencies, and (3) Havel has an interest in protecting Pen-Link's reputation.

[7] The government presented conflicting testimony about the practice of the Montgomery County Detectives Bureau in finalizing wiretap recordings.  Havel testified that Detective Evans would sometimes call Pen-Link for instructions about finalizing optical discs without having Pen-Link "tunnel in" to their server.  Tr. Pretrial Mots. Hr'g Day 2 at 186.  Lieutenant Forzato testified that finalization is "not that simple" and that only Pen-Link could finalize the wiretap recordings in order "to hold them responsible to finalize the CD properly."  Tr. Pretrial Mots. Hr'g Day 1 at 150.  Lieutenant Forzato also testified that neither he nor "the [B]-Tech that was employed in our office" were comfortable using the finalization program by themselves.  *Id.*; Tr. Pretrial Mots. Hr'g Day 2 at 16 ("Our office has never done that . . . it is so important to get the discs finalized properly that we use Pen-Link personnel to actually do that job.").  Detective Evans did not testify, but Detective Echevarria stated that he believed that only Pen-Link could complete finalization, although he was "not sure of that process."  Tr. Pretrial Mots. Hr'g Day 1 at 55.

Tronoski and Feighan wiretaps ended on March 26, 2010, but Lieutenant Forzato decided that he would wait until surveillance on the remaining wiretaps was complete before finalizing the wiretap recordings because the investigation was coming to a close.

The police intended to terminate surveillance on the wiretaps after search warrants were executed.   Tr. Pretrial Mots. Hr'g Day 2 at 140.  On Monday, March 29, 2010, police received authorization for over forty search warrants and an extension of the wiretap on Joseph Vito Mastronardo, Jr.  Police executed the search warrants on Wednesday, March 31, 2010.  At 1:43 p.m. on Thursday, April 1, 2010, Lieutenant Forzato sent an email to the detectives assigned to the case with a list of twelve steps to close the investigation in the case.  The email directed officers to, *inter alia*, draft criminal complaints, resolve outstanding issues arising from the execution of search warrants, and take "Original Tapes and Original Logs to Judge."  At 2:55 p.m. on Thursday, April 1, 2010, the police terminated surveillance on the remaining wiretaps.

Friday, April 2, 2010 marked the beginning of a three-day weekend in observance of Good Friday and Easter.  At 8:41 a.m. on Monday, April 5, 2010, Lieutenant Forzato sent a follow-up email to the entire Narcotics Enforcement Team requesting assistance to "cleanup the wiretap case" and asking that Detective Evans "Get the Original Recordings pulled, put them on a property record, and work with Holtzman to get all the Original Logs ready for delivery to Judge Gantman."   By April 6, 2010, Detective Evans had finalized the wiretap recordings, and Detective Holtzman had prepared the wiretap reports and monitor logs.  On April 7, 2010, ADA Lupinacci proofread and approved the proposed sealing orders, and Detective Holtzman arranged

---

The Court finds that the customary practice of the Montgomery County Detectives Bureau at the time in question was to allow only Pen-Link to finalize wiretap recordings.  The Court does not credit Havel's testimony on this issue because he is a Pen-Link customer-service engineer who performed work for multiple law-enforcement agencies, and he is less familiar with the practice of the Montgomery County Detectives Bureau than Lieutenant Forzato and Detective Echevarria.

for a meeting with the wiretap clerk in Judge Gantman's chambers.  On April 7, 2010, Judge

Gantman sealed the monitor logs, optical discs containing the wiretap recordings, and wiretap

reports.

## III.  DISCUSSION

Defendants raise six challenges to the investigation that led to their indictment: (1)

wiretap interceptions were improperly minimized; (2) wiretap recordings were not timely sealed;

(3) affidavits for GPS surveillance contained material false information; (4) other affidavits

contained material false information; (5) wiretaps were not necessary; and (6) wiretaps were not

authorized by a judge of competent jurisdiction.  The Court addresses each challenge in turn.

### A.  Minimization of Wiretap Recordings

Defendants argue that the wiretaps must be suppressed for failure to minimize non-

pertinent conversations in accordance with 18 U.S.C. § 2518(5).  Section 2518(5) requires that

wiretaps be "conducted in such a way as to minimize the interception of communications not

otherwise subject to interception."  Minimization is satisfied if "agents have shown a high regard

for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion."

*United States v. Armocida*, 515 F.2d 29, 42 (3d Cir. 1975) (quoting *United States v. Tortorello*,

480 F.2d 764, 784 (2d Cir. 1973)).  The "inquiry is on the 'reasonableness' of minimization

efforts, under the totality of the circumstances."  *United States v. Hull*, 456 F.3d 133, 142 (3d

Cir. 2006).

"Although statistical details of wire intercepts are by no means determinative on the issue

of minimization, they do provide a starting point for [the] analysis of the government's conduct

in monitoring conversations."  *Armocida*, 515 F.2d at 43.  Three factors are "crucial and must be

considered in any review of minimization": (1) "the nature and scope of the criminal enterprise

under investigation"; (2) "the government's reasonable expectation as to the character of, and the parties to, the conversations"; and (3) "the degree of judicial supervision by the authorizing judge." *Id.* at 44. Generally, courts should not consider calls shorter than two minutes when deciding whether minimization of phone calls is appropriate. *United States v. McPherson*, Crim. No. 90-304, 1991 WL 16493, at *1–2 (D.N.J. Jan. 30 1991) (citing *Armocida*, 515 F.2d at 45).

The Court concludes that, under the totality of the circumstances, the minimization in this case was reasonable. The government intercepted 1,353 calls over two minutes, and of those, 498 were deemed non-pertinent at the time the interception ended. The government minimized 283, approximately 57%, of the total number of identifiably non-pertinent calls over two minutes. The Court finds that the statistics show "at the least a substantial effort was made to limit the number of interceptions and to minimize the interception of non-pertinent, 'innocent' calls." *Armocida*, 515 F.2d at 43 (finding the same for wiretaps where 70% and 46% of calls over two minutes were minimized and only 44% and 59% of the fully recorded conversations, respectively, were pertinent).

Each of the factors identified in *Armocida* supports a broad interpretation of what "reasonable" minimization allows under the circumstances of this case. The Court finds that the nature and scope of the bookmaking conspiracy forced monitors to listen to potentially non-pertinent conversations because betting activity can be intertwined with social conversation. Discussing sports can lead to conversations about betting, and making social plans can lead to conversations about "settling up" accounts. The scope of the conspiracy was also quite broad — spanning hundreds of bettors and reaching multiple states. Moreover, the reasonable expectation of the police about the identity of the parties weighs against overly cautious minimization. Police began intercepting Feighan and Tronoski's phones to, *inter alia*, garner information about

13

the identity of co-conspirators.  Quickly minimizing calls from unknown individuals before

monitors knew the nature of the relationship between the target and the caller would defeat the

purpose of the interception.

Finally, the Court finds that the degree of judicial supervision allowed monitors greater

discretion when minimizing calls in this case.  Judge Gantman ordered that the police provide

reports about active wiretaps every ten days.  Progress reports included notations about the

number of calls intercepted, the number of calls minimized, information from pertinent

conversations, and copies of the monitor logs.  *See, e.g.*, Ex. G-1 Tab F at 2 ("[T]hirty three

completed calls were intercepted.  Six of the aforementioned conversations were deemed

'pertinent' to the present investigation.  None of the calls during this time period were

minimized.")  Because the Pennsylvania Superior Court regularly reviewed the number of

intercepted calls, the number and type of calls minimized, and the contents of recorded

conversations, the police were subject to regular oversight in monitoring the wiretaps.  Thus, the

discretionary choices by police monitors about minimization are entitled to greater deference.

Defendants argue that "the monitoring officers disregarded the express terms of both the

authorization order and its implementing directive."  Revised Mem. in Supp. of Mot. to Suppress

Wiretap and Physical Evid. 12 (Document No. 255).  In support, defendants cite three pieces of

evidence: (1) at least twenty non-pertinent calls were fully recorded; (2) police knowingly

recorded two conversations between Joseph Vito Mastronardo, Jr.'s and his accountant, which

defendants believe violated the directive to minimize privileged communications; and (3) the

number of police monitors was insufficient to monitor and minimize five wiretaps.

The Court finds that the police did not disregard the minimization directive.  First,

defendants only cite short segments of recorded conversations in their response.  Assuming,

*arguendo*, that every conversation cited by defendants was over two minutes and non-pertinent, the progress reports submitted to Judge Gantman still demonstrate that police followed the minimization directive.  "[Title III] does not forbid the interception of all nonrelevant conversations."  *Scott v. United States*, 436 U.S. 128, 140 (1979).  Simply because monitors have listened to a conversation that failed to become pertinent does not mean they failed to minimize; monitors need only a reasonable belief that the conversations will become pertinent.  Given the scope of the conspiracy, the number of calls minimized, and the parties involved in the conversations, the Court finds that the cited conversations do not show police disregarded the minimization directive.

Second, the police did not record Joseph Vito Mastronardo, Jr.'s conversations with his accountant as a result of neglect or by accident.  Lieutenant Forzato decided the calls between Joseph Vito Mastronardo, Jr. and his accountant should be recorded because he believed that the conversations constituted an ongoing crime and, as such, could be lawfully recorded because they were not subject to the state-law accountant-client privilege.  Tr. Pretrial Mots. Hr'g Day 2 at 143.  Rather than showing that the police disregarded minimization, Lieutenant Forzato's testimony evidences an informed intent to record only conversations that were not within the bounds of the state minimization directive.

Third, the Court finds that the number of monitors was sufficient to effectively minimize the wiretaps.  Minimization efforts must be reasonable, not exhaustive.  Monitoring stations for four of the five wiretaps were located in the same room, and monitors could observe multiple wiretaps simultaneously if the phone numbers were not in use at the same time.  Four to seven monitors watched the intercepted lines each day.  The police usually assigned two monitors to a twelve-hour morning shift from 7:00am to 7:00pm and two monitors to a twelve-hour evening

shift from noon until midnight.  Regularly, one to three additional monitors would sign in during business hours to help monitor the ongoing wiretaps.  *See* Ex. D-9.  Further, the monitor logs do not include other technicians present in the wiretap facility who could assist if needed.  Tr. Pretrial Mots. Hr'g Day 1 at 38–39.  Given the number of monitors present, the proximity of the wiretap stations, and the percentage of non-pertinent calls minimized, the police assigned a reasonable number of monitors to the wiretaps.

Defendants next argue that the minimization directive is overbroad because it instructed monitors to record non-pertinent conversations for five minutes during the first five days of the wiretaps.  Although a blanket directive may fail in some cases, "[w]hether a particular order has made provision for appropriate minimization depends on an analysis of the circumstances of each case."  *United States v. Vento*, 533 F.2d 838, 852 (3d Cir. 1976).  Although fewer calls were minimized at the beginning of the wiretaps, this was appropriate given the need for police to identify members of the conspiracy and the language and terminology they use to describe betting activity.  Lieutenant Forzato and ADA Lupinacci met with monitors before the wiretaps were activated to explain what conversations needed to be minimized, and they held another meeting to "tighten up" the directive after the first week. Tr. Pretrial Mots. Hr'g Day 1 at 131–32.  The Court concludes that the blanket instructions to record for five minutes during the first five days of the wiretaps was reasonable given the nature and scope of the conspiracy.

For the foregoing reasons, the Court concludes that the police took reasonable steps to minimize non-pertinent conversations, and defendants' motion to suppress the wiretaps on that ground is denied.

### B.  Sealing of Wiretaps Recordings

Defendants next argue that all five wiretaps were not sealed immediately in accordance with 18 U.S.C. § 2518(8)(a) and that the government has failed to offer a satisfactory excuse for the delay.  Section 2518(8)(a) states:

> Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. . . . The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom [while giving testimony under oath or affirmation in any proceeding of the United States].

The purpose of the sealing requirement "is to ensure the reliability and integrity of evidence obtained by means of electronic surveillance." *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990).  "Violation of this statute requires suppression if the sealing was not 'immediate' and if the government fails to provide any 'satisfactory explanation for the delay.'" *United States v. Bansal*, 663 F.3d 634, 652 (3d Cir. 2011) (quoting *Ojeda Rios*, 495 U.S. at 264–68).  If wiretap recordings are sealed immediately, the inquiry ends.  *United States v. Carson*, 969 F.2d 1480, 1491 (3d Cir. 1992).  "The term '[i]mmediately' means that the tapes should be sealed either as soon as practical after the surveillance ends or as soon as practical after the final extension order expires."  *United States v. Williams*, 124 F.3d 411, 429 (3d Cir. 1997).

### i.      Wiretap Recordings of Joseph V. Mastronardo, John Mastronardo, and Eric Woehlcke

Surveillance on the wiretaps on the phones of Joseph Vito Mastronardo, Jr, John Mastronardo, and Woehlcke ended on April 1, 2010.  None of the orders authorizing the wiretaps had expired when Judge Gantman sealed the recordings on April 7, 2010.  Defendants argue that

17

the six-day interval between the end of surveillance and sealing constituted a delay for which the

government does not have a satisfactory explanation.  The government responds that (1) police

had no obligation to seal the wiretaps until the authorizing orders expired, or (2) the wiretap

recordings were sealed immediately after April 1, 2010.

The Court concludes that, even if the government had an obligation to seal the wiretap

recordings after surveillance ended on April 1, 2010,[8] the recordings were sealed "immediately."

Sealing after a six-day delay is immediate when the delay includes an intervening weekend.

*Carson*, 969 F.2d at 1498.  In this case, the wiretaps were terminated on April 1, 2010, which

was the Thursday before the Pennsylvania Superior Court closed for Good Friday.  When the

intervening three-day weekend is considered, the wiretap recordings were sealed immediately.

### ii.    Wiretap Recordings of Patrick Tronoski and Edward Feighan

The government concedes that the Feighan and Tronoski wiretaps were not sealed

immediately and, thus, that they are required to provide a satisfactory explanation for the

thirteen-day delay between the expiration of the orders authorizing the wiretaps on March 26,

2010 and the sealing of the wiretaps on April 7, 2010.

"The excuse offered must be objectively reasonable and must be the actual reason for the

delay, based on the evidence presented and submissions made in the District Court, and not

merely a post hoc rationalization."  *Carson*, 969 F.2d at 1492.  There are two permissible types

of excuses for a delay: (1) "relatively short [administrative] delays necessitated by the process

required to comply with the provisions of the Act" and (2) "longer delays attributable to non-

administrative, objectively reasonable causes."  *Id.* at 1488.  The Third Circuit has accepted three

---

[8] Whether the government must seal the tapes upon the termination of surveillance or the
expiration of the order authorizing the wiretaps is an open question in the Third Circuit.  *United
States v. Vastola,* 915 F.2d 885, 875 n.16 (3d Cir. 1990) [*Vastola II*].

explanations for non-administrative delays:  (1) reasonable mistakes of law, (2) reasonable

mistakes of fact, and (3) unforeseen emergencies.  *Bansal*, 663 F.3d at 652.

The Court finds that the actual reason for the delay was twofold: (1) the seven-day delay

from March 26, 2010 until April 1, 2010 was caused by Lieutenant Forzato's mistaken belief that

wiretap recordings could not be finalized while other wiretaps were ongoing, and (2) the six-day

delay from April 2, 2010 until April 7, 2010 was an administrative delay.  The Court concludes

that the first delay was the result of a reasonable mistake of fact, and the second constituted a

relatively short administrative delay necessitated by compliance with Pennsylvania.

### a.  Finalization of Wiretap Recordings

Lieutenant Forzato mistakenly believed that the wiretap recordings could only be

finalized by having Pen-Link "tunnel in" to the wiretap server, and he had prohibited them from

doing so because he thought "tunneling in" would jeopardize ongoing wiretaps.  "Absent any

indication of tampering, bad faith, or deliberate disregard for the requirements of Title III," an

officer must act "as a reasonably prudent government agent would have" for a mistake of fact to

qualify as a satisfactory explanation for a delay in sealing.  *Bansal*, 663 F.3d at 653.  In *Bansal*,

an Assistant United States Attorney made a mistake of fact regarding when a CD containing

intercepted emails would be available for sealing.  *Id.* at 651.  The Third Circuit determined that

the seven-day delay was excusable because the attorney made the mistake "in good faith

regarding the mechanics of the sealing process" and the attorney "had knowledge of and fully

intended to comply with the sealing requirements."  *Id.* at 653.  The Court concludes that the

delay in this case from March 26, 2010 until April 1, 2010 was the result of a reasonable mistake

of fact.

First, the mistake in this case was made in "good faith regarding the mechanics of the sealing process." The Court finds no evidence that police tampered with the recordings, delayed sealing in bad faith, or deliberately disregarded the sealing requirements. On the contrary, the police were motivated by a concern to preserve the integrity of the recordings. Lieutenant Forzato reasonably believed that the splitting of call data and audio onto different wiretap recordigns on March 11, 2010 presented an "alarming evidentiary problem." Tr. Pretrial Mots. Hr'g Day 1 at 143. Out of concern for the integrity of the evidence, he forbade Pen-Link from accessing the wiretap server to "trouble shoot, repair, [or] finalize" while other wiretaps were ongoing. *Id.* at 148–49. Lieutenant Forzato reasonably believed that allowing Pen-Link to "tunnel in" to the server would cause call data and audio to split. He was mistaken, however, that finalization of the wiretap recordings required Pen-Link to remotely access the wiretap server. Tr. Pretrial Mots. Hr'g Day 2 at 186. Because finalization must be completed before the optical discs that store wiretap recordings can be removed from the server, Lieutenant Forzato's mistake concerns the mechanics of the sealing process in the truest sense — "gathering the tapes, putting them in a box and taking the tapes to the supervising judge." *Carson*, 969 F.2d at 1489.

Next, the Court finds that Lieutenant Forzato "had knowledge of and fully intended to comply with the sealing requirements." *Bansal*, 663 F.3d at 653. Lieutenant Forzato had taught classes on electronic surveillance, including classes on federal law, for over twenty years. Moreover, the delay in sealing was "not the result of sloth, inattention, or carelessness." *United States v. Bansal*, Crim. No. 05-193, 2006 WL 516766 (E.D. Pa. Mar. 1, 2006). According to sign-in logs, police completed surveillance on the Joseph Vito Mastronardo, Jr., Woehlcke, and John Mastronardo wiretaps on April 1, 2010 at 2:55 p.m. Ex. D-9 at USA-139966. Lieutenant Forzato sent an email on April 1, 2010 at 1:43 p.m. to the detectives and technicians working on

the case to, *inter alia*, take "Original Tapes and Original Logs to Judge." Def. Ex. D-1 at USA-140112; *see also* Tr. Pretrial Mots. Hr'g Day 2 at 29 ("So when I say to Dave, get the dis[c]s pulled, he and I have an understanding of the basics of Pen-Link, what that means is make sure the optical dis[c]s are removed from the system and that they're placed in envelopes and taken to the judge."). Given the contemporaneous evidence, the Court finds that Lieutenant Forzato intended to immediately finalize the optical discs and provide the recordings to Judge Gantman for sealing.

Defendants argue that Lieutenant Forzato's mistake of fact was not reasonable because he failed to take preventative measures before the Tronoski and Feighan wiretap authorizations expired. For a mistake of fact to be objectively reasonable, an officer must act "as a reasonably prudent government agent would have." *Bansal*, 663 F.3d at 653. Defendants support their argument with two pieces of evidence: (1) both Lieutenant Forzato and Detective Echevarria had seen the call splitting occur before, Tr. Pretrial Mots. Hr'g Day 1 at 25–26, 147; and (2) Chris Havel, a client-services engineer from Pen-Link, testified that finalization can be completed over the phone without having Pen-Link "tunnel in" to law enforcement servers. Tr. Pretrial Mots. Hr'g Day 2 at 186. Defendants argue, in essence, that a reasonably prudent government agent would have solved the data splitting problem differently. The Court rejects defendants' arguments and concludes that the mistake of fact was objectively reasonable.

The Court agrees that a reasonably prudent government agent has an affirmative duty to anticipate and prevent potential problems, but the existence of an undiscovered, alternative technical solution is not evidence that a government agent acted unreasonably. The question is whether, given the information available to the agent at that time, the decision actually made by the agent was reasonable. In *Bansal*, the district court considered the government agent's

experience with the method of interception, the volume of intercepted communications, the existence of attendant technical problems, and the length of the delay in sealing.  2006 WL 516766, at *7, *8.  In this case, the Court concludes that Lieutenant Forzato's decision to delay finalization for six days rather than risk the integrity of the active wiretaps was reasonable.

Lieutenant Forzato's decision that Pen-Link would not be allowed to "tunnel in" until the termination of surveillance on the active wiretaps was reasonable.  Lieutenant Forzato lacked expertise in the technical side of the Pen-Link's system;[9] the police intercepted seven calls on March 10 and March 11, 2010 with no audio or call data, which was a technical problem requiring Pen-Link to "tunnel in"; and the March 11, 2010 splitting of call data and audio files onto different wiretap recordings presented a new and serious evidentiary problem that threatened the integrity of the recordings.  By March 11, 2010, four wiretaps were running simultaneously with anywhere from four to seven monitors watching the lines at different times throughout the day.  Given the seriousness of the evidentiary problem and the complexity of the ongoing investigation, Lieutenant Forzato's choice to tolerate lesser problems with the wiretaps in lieu of technical support was reasonable.  *See* Tr. Pretrial Mots. Hr'g Day 1 at 147–48.

Lieutenant Forzato's decision to delay finalization until the termination of the active wiretaps was also reasonable.  Lieutenant Forzato did not realize that the prohibition on "tunneling in" would prevent police from finalizing the wiretap recordings until March 25, 2010, the day before the wiretaps ended.  Tr. Pretrial Mots. Hr'g Day 2 at 19.  Lieutenant Forzato's

---

[9] Lieutenant Forzato stated that "We paid Pen-Link a lot of money every year for maintenance for calls, and so I wanted Pen-Link to go through the program to finalize the tapes.  They're the ones that designed this system and I wanted to hold them responsible to finalize the CDs."  Tr. Pretrial Mots. Hr'g Day 1 at 150.  "With the computer problems, it makes me particularly nervous because I'm not a computer scientist and I'm not an engineer.  So it's not, I can't just climb the phone pole and fix it or send out a recorder for repair and bring in a new one."  *Id.* at 148.

failure to anticipate the problem with finalization was reasonable because, when he decided to

prohibit Pen-Link from "tunneling in" on March 11, 2010, the investigation was at a critical

stage.  Lieutenant Forzato was listening to pertinent conversations, preparing affidavits for

search warrants, and managing the personnel assigned to the case, including the monitors who

watched the tapped phones from 7:00 a.m. until midnight.  *Id.*  Given his knowledge on March

25, 2010 that the remaining wiretaps would only be active until the search warrants were

executed — an additional six days — Lieutenant Forzato's decision to delay finalization rather

than risk the integrity of the active wiretaps was reasonable.  Tr. Pretrial Mots. Hr'g Day 1 at

235.

### b.  Administrative Delay

The Court concludes that the six-day delay from April 2, 2010 until April 7, 2010

constituted a "relatively short administrative delay necessitated by the process required to

comply with the provisions of the Act."  *Carson*, F.2d at 1488.   The Court is required to

examine whether the administrative delay constituted a satisfactory excuse, not whether the

sealing of the wiretap was immediate.  The Court considers three factors: (1) the "necessary

steps" to seal wiretap recordings, (2) "delays dictated by the practicalities" of sealing, and (3)

administrative difficulties.  *See Carson*, 969 F.2d at 1489.  The Court finds that the wiretaps

were sealed as soon as administratively practical after surveillance was terminated on April 1,

2010.

The Court finds evidence of four necessary steps to seal the wiretap recordings: (1)

Detective Evans had to call Pen-Link to "tunnel in" and finalize the wiretap recordings; (2)

Detective Holtzman had to assemble the wiretap recordings and prepare the wiretap reports,

monitor logs, and sealing orders; (3) the sealing orders had to be proofread by ADA Lupinacci;

and (4) Detective Holtzman had to arrange for a meeting with the wiretap clerk in Judge

Gantman's chambers.  *See* Ex. D-1 at USA-140112 *et seq.*; Ex. G-23.

The Court finds that the delay from April 1, 2010 until April 7, 2010 was a relatively

short administrative delay.   Nothing in the record suggests that police were less than diligent.

On Thursday, April 1, 2010, Lieutenant Forzato sent an email to the five detectives on the case

forty minutes before surveillance on the active wiretaps terminated.  *Compare* Ex. D-1 at USA-

140112 (email at 1:43 p.m.), *with* Ex. D-9 at USA-139966 (wiretap terminated at 2:25 p.m.).  In

addition to ordering that "Original Tapes and Original Logs [be taken] to Judge," the email

directed that officers draft criminal complaints and resolve outstanding issues arising from the

execution of search warrants two days earlier.  Ex. D-1 at USA-140112.   The Pennsylvania

Superior Court was closed for the next three days in observance of Good Friday and Easter.  At

8:41 a.m. on the Monday after the holiday weekend, Lieutenant Forzato sent an email to "All

NET personnel" requesting help to "cleanup the wiretap case" and directing Detective Evans to

finalize the wiretap recordings and assist in preparing the monitoring logs.  *Id.* (following page);

Tr. Pretrial Mots. Hr'g Day 2 at 29.  By Wednesday April 7, 2010, Detective Holtzman had

written the wiretap reports and assembled the evidence, ADA Lupinacci had proofread and

approved the sealing orders, and the wiretaps were sealed by Judge Gantman.  Ex. G-23; Ex. G-1

Tab H.  Given the workload of the detectives on the case, the intervening three-day weekend,

and the extra officers assigned to "cleanup" the case after the weekend, the Court finds that this

was a "relatively short administrative delay necessitated by the process required to comply with

the provisions of the Act."  *Carson*, F.2d at 1488.

For the foregoing reasons, the Court concludes that the government has offered a satisfactory explanation for the delay in sealing the wiretaps recordings. Defendants' motion to suppress for failure to timely seal the wiretap recordings is denied.

### C. Misstatements of Fact in GPS Application Affidavits

Defendants seek to suppress evidence derived from GPS surveillance of the vehicles of Joseph Vito Mastronardo, Jr., Edward Feighan, and Patrick Tronoski. Defendants concede that police needed only reasonable suspicion to monitor defendants' vehicles using GPS tracking devices.[10] They argue, however, that, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), the police did not have reasonable suspicion once false statements in the affidavits made knowingly or intentionally or with reckless disregard for the truth are set aside.[11]

When a defendant makes a "substantial preliminary showing" that an affiant has made a false statement knowingly or intentionally, the district court must hold an evidentiary hearing at defendant's request. *Franks*, 438 U.S. at 155–56. If the defendant proves by a preponderance of the evidence that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement necessary to a finding of reasonable suspicion in the affidavit, "the fruits of the search [must be] excluded to the same extent as if [reasonable suspicion] was

---

[10] Defendants made the concession in Supplemental Memorandum in Support of Motions to Suppress Evidence (Document No. 325). For those defendants who did not join in defendants' Supplemental Memorandum, the Court also concludes that police needed only reasonable suspicion to use GPS tracking devices. The basis of the Court's opinion on this issue is included in the Order dated December 13, 2013, ruling on defendant Edward Feighan's Motion to Suppress Evidence (Document No. 240).

[11] Although defendants never identify the affidavits they challenge with particularity, the Court believes defendants challenge statement in the affidavits dated August 18, 2009 and December 15, 2009 supporting authorization of GPS surveillance on Feighan's vehicle, the affidavits dated September 14, 2009, December 3, 2009 and March 3, 2010 supporting authorization of GPS surveillance on Joseph Vito Mastronardo, Jr.'s vehicle, and the affidavit dated January 15, 2010 supporting authorization of GPS surveillance on Tronoski's vehicle ("GPS affidavits").

lacking on the face of the affidavit." *Id.* at 155–56. "Thus, in order to secure suppression of the fruits of the search, a defendant must show both that bad faith or reckless disregard existed on the part of the affiant, and that there would have been no [reasonable suspicion] but for the incorrect statement." Frost, 999 F.2d at 743.

Without determining whether defendants made a substantial preliminary showing, the Court held a three-day evidentiary hearing on all pending motions.  Defendants argue that two statements in the GPS affidavits should be set aside: (1) statements that Feighan used a secondary phone to contact Joseph Vito Mastronardo, Jr. and (2) statements that Feighan delivered money to Joseph Vito Mastronardo, Jr. at the Cedarbrook Country Club.  For the reasons that follow, the Court concludes that neither of the statements was knowingly or intentionally false or made with reckless disregard for the truth, and that police had reasonable suspicion that warranted GPS surveillance. The Court addresses each statement in turn

### i.    Feighan Used a Secondary Phone to Contact Joseph Vito Mastronardo, Jr.

Beginning with the GPS affidavits dated September 14, 2009, Detective Vinter stated that Feighan used a secondary phone to stay in touch with Joseph Vito Mastronardo, Jr.  Detective Vinter suspected Feighan was using a secondary phone after finding a number for an individual named "Ed Fagan" in photographs of a laminated sheet of phone numbers from Joseph Vito Mastronardo, Jr.'s car, which he obtained on August 25, 2010.  Defendants argue that the statements were made with reckless disregard for the truth and should be set aside.  Defendants support their argument with three facts: (1) the name on the laminated sheet was spelled incorrectly, (2) police could not trace the subscriber on the phone to Feighan, and (3) the toll records of the number on the laminated sheet did not reveal calls with any known phone number associated with defendants.

The Court concludes that statements in the GPS affidavits that Feighan used a secondary phone to communicate with Joseph Vito Mastronardo, Jr. were not made with reckless disregard for the truth. The statements were reasonable based on the facts available to the affiant when made. The photographs of the laminated sheet contained phone numbers for two individuals Detective Vinter believed were associated with the 2006 investigation: (1) "Pat TT" — a known number for Patrick Tronoski — and (2) "Ed Fagan" — registered as a prepaid cell phone. After examining the photographs of the laminated sheet, Detective Vinter interviewed CS1, who reported that he had seen Feighan use a secondary cell phone. Police reasonably believed that information from CS1 was reliable. Although subscriber information for the prepaid "Ed Fagan" number was unavailable, Detective Echevarria testified that the proliferation of prepaid cell phones makes it difficult to obtain subscriber information. Tr. Pretrial Mots. Hr'g Day 1 at 42. Further, the absence of calls to the known phone numbers of defendants fails to prove that the phone did not belong to Feighan. Thus, the Court concludes that statements in the GPS affidavits that Feighan used a secondary phone to communicate with Joseph Vito Mastronardo, Jr. were not made with reckless disregard for the truth.

### ii. Feighan Met Joseph Vito Mastronardo, Jr. at the Cedarbrook Country Club

Detective Vinter stated in all the GPS affidavits that CS1 had heard Feighan, on at least one occasion, plan to "drop off" money with Joseph Vito Mastronardo, Jr. at the Cedarbrook Country Club. Defendants argue that those statements should be set aside because the affidavits contain minor inconsistencies about when CS1 met with Detective Vinter and whether Feighan used a secondary phone.

The first affidavit to reference the Cedarbook Country Club was included in the August 18, 2009 application for GPS surveillance of Feighan's vehicle. The affidavit attributed the

27

statement to CS1 at a May 2009 meeting, in which CS1 stated that he "overheard Edward Feighan saying that he had an exuberant amount of money that he needs to drop off to Joseph V. Mastronardo at Cedarbrook Country Club."  In the September 14, 2009 and December 3, 2009 applications for GPS surveillance of Joseph Vito Mastronardo, Jr.'s vehicle, the affidavit added the phrase "as [Feighan] was using a secondary cellular phone to converse with Joseph Mastronardo." Finally, in the February 2010 Tronoski and Feighan wiretap application and the March 2010 search warrant application for Joseph Vito Mastronardo, Jr.'s residence ("non-GPS affidavits"), the affiant attributed the Cedarbrook Country Club statement to a September 2009 meeting with CS1 rather than a May 2009 meeting.

The Court finds that (1) CS1 told police in May 2009 that Feighan planned to deliver money to Joseph Vito Mastronardo, Jr. at the Cedarbrook Country Club, Tr. Pretrial Mots. Hr'g Day 3 at 131, and (2) CS1 told police on September 9, 2009, for the first time, that Feighan used a secondary phone to speak with Joseph Vito Mastronardo, Jr. during the conversation he had previously reported to police in May 2009, Tr. Pretrial Mots. Hr'g Day 1 at 112–13; Ex. D-1 at USA-4530.

The Court concludes that statements in the GPS affidavits that Feighan delivered money to Joseph Vito Mastronardo, Jr. at the Cedarbrook Country Club should not be set aside.  The absence of a statement about the use of a secondary phone in the August 18, 2009 affidavit was consistent with the Detective Vinter's knowledge at that time.  Detective Vinter testified that he came to suspect that Feighan was using a secondary phone only after examining photographs of the laminated sheet on August 25, 2009.  Detective Vinter met with CS1 on September 9, 2009 in an effort to obtain additional information about CS1's May 2009 statements. At that time, for the first time, CS1 stated that the conversation he overheard between Feighan and Joseph Vito

Mastronardo, Jr. took place on a different phone than the one on which CS1 called Feighan.  Tr. Pretrial Mots. Hr'g Day 1 at 112–13; Tr. Pretrial Mots. Hr'g Day 3 at 185–86; Ex. D-1 at USA-4530.  Although Detective Vinter could have included that information in the September 14, 2009 and December 3, 2009 affidavits, it was not necessary.

The Court finds that the affiant made a good-faith mistake in the non-GPS affidavits when he incorrectly said that CS1's May 2009 statements about the Cedarbrook Country Club were made in the September 9, 2009 interview.  Tr. Pretrial Mots. Hr'g Day 3 at 130–31 ("Q: At least the way this reads, the confidential source overheard this conversation in September of 2009, correct?  A: Yes, and that's not possible.").  The Court finds that the police did not, in any affidavit, alter their representations about the statements of CS1 with reckless disregard for the truth.  Thus, statements that Feighan delivered money to Joseph Vito Mastronardo, Jr. at the Cedarbrook Country Club should not be set aside when considering the GPS affidavits.[12]

For the foregoing reasons, defendants have failed to prove by a preponderance of the evidence the challenged statements in the GPS affidavits were knowingly or intentionally false or made with reckless disregard for the truth.  Thus, the Court finds that the police had reasonable suspicion of criminal activity, and the part of defendant's motion seeking to suppress the fruits of the GPS surveillance is denied.

---

[12] To the extent defendants request the suppression of evidence derived from affidavits where the affiant mistakenly references a September 2009 conversation instead of a May 2009 conversation — the Tronoski and Feighan wiretaps and the search warrant for Joseph Vito Mastronardo, Jr.'s residence — the Court concludes that the September date of the conversation is not essential to the finding of probable cause.  The criminal activity in each affidavit is alleged to have occurred continuously since at least 2006; thus, a 2009 conversation occurring in May as opposed to September does not demonstrate staleness.  *Williams*, 124 F.3d at 420 ("Thus, when criminal activity has been going on continuously for years, staleness is of less concern.").

D.      **Other Misstatements of Facts**

In their memorandum of law, defendants requested a *Franks* hearing and challenged two additional statements to make a "substantial preliminary showing" that an affiant knowingly or recklessly made a false statement.  First, defendants challenged statements — made in the affidavits of probable cause for the Feighan and Tronoski wiretaps — that CS1 wished to remain anonymous "due to fear of harassment, retaliation, and or physical violence."  Defendants also challenged statements — made in the affidavit of probable cause for the March 29, 2010 wiretap extension for Joseph Vito Mastronardo, Jr. — that implicated Carlos Molina Sobrino in the bookmaking conspiracy.

"[I]n order to secure suppression of the fruits of the search, a defendant must show both that bad faith or reckless disregard existed on the part of the affiant, and that there would have been no probable cause but for the incorrect statement." Frost, 999 F.2d at 743.  Neither statement challenged by the defendant is necessary to establish probable cause.  Thus, *Franks* is inapplicable, and the Court need not reach the issue of whether the statements were made in bad faith or with reckless disregard for the truth.  Defendants' motion to suppress evidence on this ground is denied.

After additional discovery, defendants challenged a third statement — that CS2 is "another, as yet unidentified person."  Defendants seek to prove either that CS2 does not exist or that CS2 is Jack Pennington, who is an individual identified by CS2 as an agent of Tronoski.  Defendants cite three supporting facts for these arguments: (1) the absence of police reports memorializing meetings with CS2; (2) notes written by the police in wiretap monitoring logs identify a caller as "POSS: JACK PENNINGTON (VINTER CI2)"; and (3) the lack of wiretap interceptions verifying that Pennington assisted Tronoski settle accounts.

The Court finds that CS2 existed.  Detective Vinter testified that CS2 is a real person he has known for around fifteen years and has met face to face.  Tr. Pretrial Mots. Hr'g Day 3 at 35, 135–36.  Lieutenant Forzato corroborated Detective Vinter's testimony because, although they had never met, Lieutenant Forzato knew the identity of CS2 and had "been in his presence" multiple times, the first of which being ten years ago.  Tr. Pretrial Mots. Hr'g Day 2 at 64, 76. Detective Vinter also testified that CS2 had previously provided information about Tronoski and explained that he did not memorialize his conversations with CS2 because he was "freshening everything up" for the current investigation and he trusted the information.  Tr. Pretrial Mots. Hr'g Day 3 at 135–36.  Lieutenant Forzato testified that CS2 was initially contacted for the investigation at issue in November 2009 but that "[w]e've had Confidential Source Number 2 for years."  Tr. Pretrial Mots. Hr'g Day 2 at 75.   Such evidence makes it abundantly clear that defendants have not met their burden of proof on the claim that CS2 does not exist.

The Court also finds that CS2 was not Jack Pennington.  Detective Vinter testified that Detective Holtzman created the caller designation "POSS: JACK PENNINGTON (VINTER CI2)" by inputting the text into a drop-down menu of callers used to populate monitor logs.  The phrase "Vinter CI2" was intended to tell monitors that the phone number related to information from CS2 and that Detective Vinter should be contacted.  Tr. Pretrial Mots. Hr'g Day 3 at 139. Lieutenant Forzato corroborated Detective Vinter's testimony on this issue.  Tr. Pretrial Mots. Hr'g Day 2 at 64.  Detective Echevarria also testified that, in his experience, a monitor would never leave the identity of a confidential source on a monitor log, and the likely purpose of the designation would be to identify the source of information about the phone number.  Tr. Pretrial Mots. Hr'g Day 1 at 46.  Based on this evidence, the Court finds that defendants have not met their burden of proof on the allegation that CS2 is Jack Pennington.

Finally, defendants argue that statements in the affidavits concerning CS2 were made with reckless disregard for the truth because the wiretap of Tronoski's phone only intercepted four phone contacts between Pennington and Tronoski from February 24, 2010 until March 26, 2010.  The Court rejects defendants' argument.  The absence of phone contact *during* the wiretap is not evidence of what Detective Vinter knew on February 24, 2010 when he signed the affidavit of probable cause to *obtain* the wiretap.[13]  When analyzing call records, police found 120 phone contacts between Tronoski and Pennington from August 31, 2009 to February 12, 2010.  Ex. G-1 at 67–68.   Additionally, CS2 had provided Detective Vinter with accurate and credible information, within the preceding five years, that led to the arrest and prosecution of four individuals for drug-related offenses in an unrelated investigation.  Ex. G-1 Tab A at 43.  For those reasons, the Court finds that statements containing information provided by CS2 prior to March 26, 2010 were not made with reckless disregard for the truth.

For the foregoing reasons, the Court denies the parts of defendants' motion seeking to suppress evidence based on the inclusion of the challenged statements in affidavits.

### E.  Necessity of Wiretaps

Defendants also seek to suppress the wiretaps because police failed to exhaust other investigatory methods in violation of 18 U.S.C. § 2518(3)(c).  Section 2518(3)(c) allows approval of a wiretap application "if the judge determines on the basis of the facts submitted by the applicant that . . . normal investigative procedures have been tried and have failed or

---

[13] Defendants never specify the statements they challenge with particularity or even the affidavits from which they requested the information be stricken.  If defendants are challenging statements in affidavits made after March 26, 2010, when police terminated the surveillance on Tronoski's wiretap, the Court finds, without reaching the issue of whether the statements were made with reckless disregard for the truth, that information from CS2 was not essential to a finding of probable cause.  After the interception of Tronoski's phone, police had sufficient information to find that Tronoski had engaged in bookmaking activity without relying on CS2.

reasonably appear to be unlikely to succeed if tried or to be too dangerous."  The government

must include "a full and complete statement as to whether or not other investigative procedures

have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to

be too dangerous."  18 U.S.C. § 2518(1)(c).

"Courts have consistently held that 18 U.S.C. § 2518(3)(c) does not require the

government to exhaust all other investigative procedures before resorting to electronic

surveillance."  *Williams*, 124 F.3d at 418.  "The government need only lay a 'factual predicate'

sufficient to inform the judge why other methods of investigation are not sufficient."  *United*

*States v. McGlory*, 968 F.2d 309, 345 (3d Cir. 1992) (quoting *Armocida*, 515 F.2d at 38).  The

government's burden is "not great."  *Armocida*, 515 F.2d at 38.  "Furthermore, in determining

whether this requirement has been satisfied, a court 'may properly take into account affirmations

which are found in part upon the experience of specially trained agents.'"  *Williams*, 124 F.3d at

418 (quoting *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989)).

The Court finds that the government has met its burden with respect to the need for the

wiretaps.  The police identified six alternative investigative techniques that "were tried and

failed, and/or are unlikely to succeed": (1) use of confidential sources, (2) infiltration by

undercover officers, (3) visual surveillance, (4) analysis from phone toll records, (5) search

warrants, and (6) grand jury proceedings.  Ex. G-1 at 76.  The police did not believe they could

develop new confidential informants or infiltrate the organization because "[o]ur experience and

training teach that criminals . . . usually deal with very close associates."  *Id.* at 78.  The police

also believed that neither CS1 nor CS2 "would be [able] to secure a proper introduction into the

organization" and "this would only arouse suspicion" about the confidential sources.  *Id.*  The

police dismissed visual surveillance and phone toll records for three reasons: (1) strange vehicles

would be noticed at important locations in the investigation, (2) phones are regularly registered

fictitiously, and (3) neither technique would provide law enforcement with sufficient information

to prosecute members of the conspiracy because police must know what a defendant is doing, not

simply who a defendant met or called.  *Id.* at 80, 82.  The police did not believe search warrants

alone would be effective because, in their experience, bookmakers rarely keep records or

proceeds in one location, which makes proving constructive possession of the seized items

difficult without additional information.  *Id.* at 82.  Finally, the police did not use the grand jury

because "there is no reason to believe that [defendants], or any of their co-conspirators would

cooperate with the grand jury, with or without grants of immunity.  Moreover, the mere initiation

of such action would render continued investigation difficult by communicating the existence of

the investigation."  *Id.* at 83.

Defendants argue that the final three wiretaps were not necessary because police already

had sufficient evidence for a conviction from the wiretaps on Tronoski and Feighan.  The Court

rejects this argument as an improper interpretation of the necessity requirement.  Section

2518(3)(c) does not require that wiretaps be used to collect the minimum amount of information

"necessary" for an investigation; rather, the text of the statute requires that the government

demonstrate that *other* investigatory tools would not be likely to succeed in gathering the type of

evidence required.  The fact that earlier wiretaps produced useful, distinct evidence that could

not be derived from normal investigatory techniques supports the government's position that the

subsequent wiretaps on three additional defendants were necessary.

Defendants next argue that wiretaps could not be necessary because police used normal

investigative techniques while the wiretaps were ongoing.  Defendants point, in particular, to the

execution of more than forty search warrants two days after the March 29, 2010 extension of the

Joseph Vito Mastronardo, Jr. wiretap, in which the affiant states that "[t]he execution of search warrants would not be feasible at this time in the investigation."  Ex. G-3 Tab H at 34.  The Court rejects defendants' argument.  Police sought the wiretap extension to track the location of illegal property if the search warrants could not be executed in the forty-eight hours authorized by Pennsylvania law, Tr. Pretrial Mots. Hr'g Day 2 at 140; Tr. Pretrial Mots. Hr'g Day 1 at 228, which was consistent with the reasoning in the underlying affidavits, Ex. G-3 Tab H at 34 ("They do this because they have learned the government has trouble proving constructive possession if the money and/or work are discovered in areas remote from the bookmaker himself.").  The police used wiretaps to collect different types of evidence than that collected pursuant to a search warrant — proof of possession of the seized items and proof of the illicit source of seized proceeds.  Thus, wiretaps were necessary, even on March 29, 2010, to effectively execute the search warrants and collect evidence the search warrants were incapable of capturing.

### F.  Authorization by a Judge of Competent Jurisdiction

Lastly, defendants challenge the jurisdiction of the Pennsylvania Superior Court to authorize wiretaps under 18 U.S.C. § 2510(9).  Section 2510(9) defines a "judge of competent jurisdiction" to mean either (1) "a judge of a United States district court or a United States court of appeals" or (2) "a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that state to enter [wiretap] orders."  Under Pennsylvania law, a judge of the Pennsylvania Superior Court must authorize "the interception of a wire, electronic or oral communication by investigative or law enforcement officers."  18 Pa. Cons. Stat. § 5708.  Defendants argue that the Pennsylvania Superior Court is a court of limited jurisdiction.

The Court disagrees and concludes that the Pennsylvania Superior Court is a court of general jurisdiction.  The Third Circuit addressed the question in a non-precedential opinion,

*United States v. Kaplan*, 526 Fed. App'x 208 (3d Cir. 2013).  The Pennsylvania Superior Court exercises general jurisdiction over all appeals from the court of common pleas 'regardless of the nature of the controversy.'"  *Kaplan*, 526 Fed. App'x at , 211–12 (citing *Newman v. Thorn*, 518 A.2d 1231, 1235 (Pa. Super. Ct. 1986) (quoting 42 Pa. Cons. Stat. § 742)).  Thus, this Court concludes that Pennsylvania Superior Court is a court of general appellate jurisdiction, and a judge of the Pennsylvania Superior Court is a "judge of competent jurisdiction" under 18 U.S.C. § 2510(9).  *Id.*

## IV.   CONCLUSION

For the foregoing reasons, the defendants' Motion to Suppress Wiretap and Physical Evidence is denied.  An appropriate Order follows.